[No. D037161. Fourth Dist., Div. One. June 15, 2001.]

KELLY MORSON et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
MEDLINE INDUSTRIES, INC., et al., Real Parties in Interest.

## COUNSEL

Rose, Klein & Marias, David A. Rosen, Arlyn M. Latin, Peter H. Crossin; Kazan, McClain, Edises, Simon & Abrams, Philip A. Harley and Susan S. Ochi for Petitioners.

Crosby, Heafey, Roach & May, James M. Wood, James C. Martin and Lisa M. Baird for Real Parties in Interest Baxter Healthcare Corporation, Baxter International, Inc., Allegiance Healthcare Corporation and Allegiance Corporation.

Wilson, Petty, Kosmo & Turner, Regina A. Petty, Frederick W. Kosmo, Jr., and Theresa Osterman Stevenson for Real Party in Interest Johnson & Johnson Medical and Tyco Healthcare Group, LP.

Gardner, Carton & Douglas, R. Michael Duffy, John A. Simon and Terry M. Hackett for Real Party in Interest Ansell Healthcare Products, Inc.

Jedeikin, Meadows & Schneider, Joseph Jedeikin, Steven Spaulding and Leopoldo J. Chanco for Real Parties in Interest Owens & Minor, Inc., and Owens & Minor West, Inc.

Morris, Polich & Purdy, Anthony G. Brazil, Gerald P. Schneeweis and Diana N. Iketani for Real Party in Interest Aladan Corporation.

Bacalski, Byrne & Koska, A. Daniel Bacalski, Jr., and Kerry F. Kawamura for Real Party in Interest Medline Industries, Inc.

Harvey M. Grossman and Hugh F. Young, Jr., for the Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Real Parties in Interest.

## OPINION

**HUFFMAN, J.**—This coordinated proceeding involves a number of plaintiffs who have filed similar products liability complaints for damages, claiming a number of defendants[1] manufactured or distributed defective products, i.e., latex gloves that the plaintiffs used in their work, that allegedly contained chemical substances (including latex and/or other substances) that were of a toxic nature, and that were causative factors in the development of the plaintiffs' latex allergies.[2]

This writ proceeding arose in response to a general order made by the trial court restricting Plaintiffs from seeking jury instructions pursuant to the consumer expectations test of design defect enunciated in *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1] (*Barker*), as applied to "claims of allergic/anaphylactic reactions caused by proteins that are endemic to natural rubber latex gloves." This order was originally made in the *McGinnis* related case and, after further briefing and offers of proof, was extended to the remaining coordinated cases to provide guidance to the trial courts that would eventually receive the

---

[1]Defendants Baxter Healthcare Corporation, Baxter International, Inc., Allegiance Healthcare Corporation, Allegiance Corporation (collectively Baxter) are one set of responding real parties in interest in these writ proceedings. Other defendants have filed joinders in their responses and returns: Aladan Corporation, Medline Industries, Inc., and Owens & Minor, Inc., and Owens & Minor West, Inc. The other lead responding real parties in interest in these writ proceedings are Johnson & Johnson Medical, together with Ansell Healthcare Products, Inc., Owens & Minor, Inc., Owens & Minor West, Inc., and Tyco Healthcare Group, LP (collectively JJM) (joined by Aladan Corporation). We refer to all these parties collectively here as Defendants.

[2]Originally there were 13, then 41, plaintiffs in these proceedings, but some have dismissed their actions. They are represented here by two different law firms as counsel for petitioners. We refer to all the plaintiff-petitioners collectively here as Plaintiffs. One of their actions has gone to jury trial on a strict liability/manufacturing defect theory, resulting in a defense verdict (*McGinnis v. Baxter Healthcare Corp.* (Super. Ct. San Diego County, 1996, No. JCCP4003-014)). We will refer to this related case as the *McGinnis* related case. Both Baxter and JJM have sought judicial notice of the trial record in that proceeding, which we now grant. (Evid. Code, §§ 452, subd. (d), 459.) An appeal is pending in this court (*McGinnis* related case (D036680, app. pending)) and briefing is not yet complete. (See also fn. 7, *post,* in which we grant an additional JJM judicial notice request of other materials.)

coordinated actions on remand for trial. (*McGhan Medical Corp. v. Superior Court* (1992) 11 Cal.App.4th 804 [14 Cal.Rptr.2d 264]: Coordination of actions will avoid duplicative and inconsistent rulings.) Plaintiffs have filed this petition for writ of mandate to seek an order from this court that the trial court's general order be set aside as contrary to law. Oppositions and returns have been filed and the matter has been orally argued, pursuant to an order to show cause.

The narrow issue before this court is whether the consumer expectations test for the existence of a design defect is justified on this record. The Plaintiffs' theory of design defect stands or falls upon their interpretation of the product's effect upon their allergic conditions, whether those conditions were incipient or well developed, because the usage of latex gloves (the product) allegedly had the effect of increasing their sensitization to the natural substance of latex in their individual biological systems. We conclude the particular circumstances of the product's failure cannot fairly be evaluated according to the common reason, experience, and understanding of the ordinary consumer, regarding whether the product's design performed below legitimate, commonly accepted minimum safety assumptions of such consumers. Accordingly, expert testimony will be essential in the medical and manufacturing fields to assist the finder of fact in understanding the relevant sequence of events and the nature of the alleged injuries. The trial court did not err in issuing the general order. We deny the petition for writ of mandate.

I

SUMMARY

A. *Allegations and Record Regarding Latex Gloves*

Each plaintiff filed his or her own action individually, and there is no standardized complaint. However, the key paragraphs of the complaints allege that Defendants manufactured and distributed latex gloves that contained chemical substances, including latex rubber and/or certain powders and/or other substances that were of a toxic nature when used independently and or in combination with other such chemical substances.[3] Plaintiffs generally allege that as a result of being continuously exposed to latex gloves with or without the substance combination, they developed "severe illnesses and injuries to the skin, including but not limited to skin discoloration, soreness, rashes, respiratory and/or other related diseases, disorders and reactions caused by extended exposure to the chemical substances contained

---

[3]The term "latex" means a dispersion of particles in water, such as particles of rubber.

in Defendants' . . . product." They also allege the latex gloves were defective due to a failure to warn that the gloves and their associated substances were highly toxic and "extremely dangerous to those that may have an allergic or chemical reaction to said product." A large number of latex glove manufacturers and distributors were named as defendants.[4]

Plaintiffs' theory of design defect is that the latex gloves supplied to them caused a serious, disabling, and potentially life-threatening allergy to all forms of natural rubber latex to develop, even though the Plaintiffs did not have this condition prior to their extensive use of latex gloves. They claim improperly designed and manufactured latex gloves may cause latex allergy by allowing excessive levels of allergenic agents, such as proteins, to remain present on the surface of the glove during manufacture. Such agents could allegedly be eliminated through washing and chlorinating procedures. The Plaintiffs claim that it became known between 1991 and 1994 that 5 to 12 percent of health care workers who are commonly exposed to latex are sensitized to that substance to the point of developing some degree of latex allergy. Such allergies can result in symptoms ranging from itching and skin irritation to anaphylactic reactions (breathing interruption). Plaintiffs therefore contend the gloves contain a design defect because although the gloves were manufactured and supplied as a safety device, they actually had the opposite effect.

Defendants respond that there can be no design defect where the Plaintiffs are subject to an allergy to an inherent feature of the product that is not man-made, i.e., latex rubber. As an exhibit to the petition, Plaintiffs attach a declaration filed by Baxter in connection with this dispute over the general order on the consumer expectations test prepared by real party in interest Allegiance Health Care Corporation's technical director, Charles Gosnell. He explains that the manufacturing process of rubber gloves involves a multistep interrelated system of production: "As an example, the manufacture of rubber gloves includes some or all of the following steps:

"a. Tapping of raw rubber from rubber trees.

"b. Preserving rubber from deterioration by addition of ammonia.

"c. Centrifuging of raw rubber.

---

[4]These exemplar allegations are taken from the record in a related appeal in the lead case, *Morson v. Baxter Healthcare Corp.* (May 2, 2001, D035334) (nonpub. opn.) of which we take judicial notice. Also, this court in *Clark v. Baxter Healthcare Corp.* (2000) 83 Cal.App.4th 1048 [100 Cal.Rptr.2d 223] (*Clark*) dealt with similar allegations in the summary judgment context.

"d. Compounding raw rubber with, among other things, sulfur.

"e. Preparation of glove molds (for positioning on continuous conveyor line).

"f. Mold dipped and washed.

"g. Mold pre-heated.

"h. Mold dipped in coagulant.

"i. Mold dried.

"j. Mold dipped in rubber compound.

"k. Rubber gloves leached in water.

"l. Rubber gloves detactified.

"m. Rubber gloves cured in oven.

"n. Post-cure leach.

"o. Post-cure rinse.

"p. Cornstarch powder application.

"q. Gloves stripped from conveyor line.

"r. Gloves tumbled.

"s. Gloves chlorinated.

"t. Gloves packaged.

"u. Gloves sterilized."

Gosnell's declaration continues, "The majority of these steps require a precise time and temperature for the product being manufactured. Additionally, each of these steps may differ from line to line, glove to glove, and plant to plant depending on line speed, temperature, plant configuration and other conditions. In order to preserve the critical qualities provided by rubber gloves, such as barrier protection and tactile sensitivity, even slight changes to the manufacturing process necessarily require that multiple confounding variables be thoroughly considered and evaluated. [¶] The multi-step manufacturing process begins with the tapping of rubber trees and the

centrifuging of raw rubber, through the packaging of the gloves. Each of the steps must be performed with an acute awareness of barrier protection issues, with an eye toward ensuring that the function of this life-saving medical device will not be compromised."

In the related *McGinnis* litigation, Defendants provided evidence of potential adverse effects from the changes in the manufacturing process suggested by Plaintiffs, such as additional washing and chlorination of the gloves. Such alterations might lead to defects in barrier protection such as pinholes and a susceptibility to tearing, a change in texture, or adverse temperature changes during manufacture.

Also in the related *McGinnis* litigation, extensive testimony was taken from various health care professionals regarding the genesis of allergic conditions in the human body, specifically with reference to allergies to natural latex rubber. These materials have been made available to us through judicial notice requests by Baxter and JJM, and in the reply appendix. Although we do not take judicial notice of the truth of the matters asserted in such materials,[5] their filing shows that the subject of allergic reactions is a complex biological and medical phenomenon, subject to dispute, that requires expert knowledge to understand and explain, for example, to a lay jury. For example, Defendants contend that the allergic reactions these Plaintiffs suffered were idiosyncratic and not caused by any design defect in the gloves.

## B. *Related Litigation and Authority*

In the same factual context of this coordinated products liability litigation over latex gloves, this court in *Clark, supra,* 83 Cal.App.4th 1048, reversed summary judgment that had been granted for the defendant manufacturers and distributors on the basis that the one-year personal injury limitations period barred the complaint. (Code Civ. Proc., § 340, subd. (3).) We held that the undisputed facts supported different inferences on whether Clark had discovered all of the essential facts to constitute a products liability cause of action when she learned of her allergy, "since triable issues of fact have been raised regarding her knowledge or awareness that a defendant's wrongdoing may have affected the product, latex gloves, that was giving rise to her allergies. [Clark] has alleged that there may have been a negligent cause of her injuries, because the latex gloves supplied may have contained added chemical substances that were toxic in nature, causing her to develop 'severe illnesses and injuries to the skin, including but not limited to skin discoloration, soreness, rashes, respiratory and/or other related diseases, disorders and

---

[5]*Day v. Sharp* (1975) 50 Cal.App.3d 904, 914 [123 Cal.Rptr. 918].

reactions caused by extended exposure to the chemical substances contained in Defendants' product.' " (83 Cal.App.4th at pp. 1058-1059.) We stated that one such permissible inference from the advice given Clark by various doctors and from the severity of a May 1995 acute reaction was that *more than a natural allergy to a natural substance was involved, and that a product defect or a contaminated product could have been a causative factor. Another such permissible inference was to the contrary.* "Thus, the record does not support only one inference as to when this knowledge was available to Clark, and 'summary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact.' (§ 437c, subd. (c).)" (*Clark, supra,* 83 Cal.App.4th at pp. 1058-1059.)

In *Clark, supra,* 83 Cal.App.4th 1048, this court stated a further reason for our conclusion: "Moreover, the record does not demonstrate any admission of knowledge or suspicion of wrongfulness as a cause of Clark's injuries or as an element of her products liability/negligence causes of action, at the time of the 1993-1994 allergic episodes. Rather, the record shows that at the end of 1995, she received the article entitled 'Patients, Health-Care Workers, and Latex Allergy,' which she claims was her first notice that anyone had committed wrongdoing with respect to latex gloves (i.e., improper or defective manufacture). This article is in the record and is authenticated by her declaration as to when she received it and its effect upon her. Under *Jolly* [*v. Eli Lilly & Co.* (1988)] 44 Cal.3d 1103 [245 Cal.Rptr. 658, 751 P.2d 923] a plaintiff must be aware of her injury, its factual cause, and sufficient facts to put her on inquiry notice of a negligent cause. (*Id.* at pp. 1109-1114.) Clark's declaration raises triable issues of fact regarding the application of the discovery rule. [Citation.]" (*Clark, supra,* 83 Cal.App.4th at p. 1059.)

We concluded our analysis in *Clark* by stating: "Due to a dearth of record evidence of admitted suspicion of wrongdoing, Clark's case is distinguishable from *Norgart* [*v. Upjohn Co.* (1999)] 21 Cal.4th 383 [87 Cal.Rptr.2d 453, 981 P.2d 79] and *Jolly, supra,* 44 Cal.3d 1103. The discovery rule here allows the statute of limitations to begin to run 'when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her.' (*Jolly* at p. 1110.) Here, there is evidence in the record to support a reasonable inference that Clark's latex allergies did not perforce lead her to suspect that the latex gloves might have been defectively manufactured in some respect. Although the statute of limitations may be applied to bar an action based upon harm immediately caused by Defendants' wrongdoing, in a case in which no timely filing has been made in relation to the immediate harm, this case does not support such an analysis. (*Miller v. Lakeside Village Condominium Assn.* [(1991)] 1

Cal.App.4th [1611,] 1622 [2 Cal.Rptr.2d 796].) Rather, Clark may not be deemed at this point to have been placed on notice, through her allergies, of potential Defendant wrongdoing. The record could support an inference that she did not become aware of a potential wrongfulness component of her cause of action until more information than the existence of her allergies placed her on inquiry notice and then was actually gained. Under the analyses of *Jolly, Norgart* and *Miller,* we conclude that triable material issues of fact remain as to the limitations issue." (*Clark, supra,* 83 Cal.App.4th at pp. 1059-1060.)

This court has also been presented with appeals of similar summary judgments granted in two other individual plaintiffs' products liability actions in the coordinated proceedings, *Armenta v. Baxter Healthcare* (Apr. 4, 2001, D035258) (nonpub. opn.) and *Morson v. Baxter Healthcare* (May 2, 2001, D035334) (nonpub. opn.). In nonpublished opinions, the defense summary judgments granted on limitations grounds were reversed under reasoning similar to that in *Clark, supra,* 83 Cal.App.4th 1048.

As already noted in footnote 2, *ante,* plaintiff McGinnis's individual action went to jury trial on her manufacturing defect theory as well as negligence and failure to warn. Due to the ruling that we currently review in this mandate proceeding, McGinnis refrained from presenting a design defect theory to her jury, instead relying on other theories. A defense verdict was obtained on failure to warn and negligence, and judgment notwithstanding the verdict was granted in favor of the defense on the manufacturing defect claim.

In addition to issuing the order to show cause in this matter, this court issued a stay order of all proceedings in the trial court to the extent that application of the consumer expectations test was involved as an issue in those coordinated cases. We stayed trial of any of the coordinated cases pending further order of this court. We granted an application by the Product Liability Advisory Council, Inc., to file an amicus curiae brief in support of Baxter, JJM, and associated defendants. (Cal. Rules of Court, rule 14 (b).)

II

ANALYSIS

A. *Applicable Standards*

In *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*), the Supreme Court clarified the

rationale for the tests set forth in *Barker, supra,* (1978) 20 Cal.3d 413, which are "two alternative ways to prove a design defect, each appropriate to its own circumstances. The purposes, behaviors, and dangers of certain products are commonly understood by those who ordinarily use them. By the same token, the ordinary users or consumers of a product may have reasonable, widely accepted minimum expectations about the circumstances under which it should perform safely. Consumers govern their own conduct by these expectations, and products on the market should conform to them." (*Soule, supra,* 8 Cal.4th at p. 566.) The Supreme Court then refined the *Barker* analysis by stating, "the consumer expectations test is reserved for cases in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions, and is thus defective regardless of expert opinion about the merits of the design." (*Soule, supra,* 8 Cal.4th at p. 567, italics omitted.)

In contrast, under different circumstances, the alternative test stated in *Barker, supra,* 20 Cal.3d 413, must be applied: A product is defective if its design embodies " 'excessive preventable danger' " (*id.* at p. 430), unless "the benefits of the . . . design outweigh the risk of danger inherent in such design" (*id.* at p. 432). As explained in *Soule,* this determination will involve "technical issues of feasibility, cost, practicality, risk, and benefit [citation] which are 'impossible' to avoid [citation]." (*Soule, supra,* 8 Cal.4th at p. 567.) "In such cases, the jury must consider the manufacturer's evidence of competing design considerations [citation], and the issue of design defect cannot fairly be resolved by standardless reference to the 'expectations' of an 'ordinary consumer.' " (*Ibid.,* italics omitted.)

 Plaintiffs here are seeking to fit their cases within the consumer expectation prong of the design defect test, as restated in *Soule* as follows: "The crucial question in each individual case is whether the circumstances of the product's failure permit an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers." (*Soule, supra,* 8 Cal.4th at pp. 568-569.) Again, "[i]n particular circumstances, a product's design may perform so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers. In such cases, a lay jury is competent to make that determination." (*Id.* at p. 569.) Examples of defects for which the consumer expectation test is proper include automobiles that explode while idling at a stoplight or roll over and catch fire in a two-mile-per-hour collision. (*Id.* at pp. 566-567, fn. 3.)

The tests set forth in *Soule, supra,* 8 Cal.4th 548, have been applied in numerous factual contexts. For example, in *Pruitt v. General Motors Corp.*

(1999) 72 Cal.App.4th 1480, 1483-1485 [86 Cal.Rptr.2d 4], the court found no error in the trial court's refusal to instruct the jury in an automotive airbag injury case on the consumer expectations test. Instead, the trial court instructed the jury on theories of risk benefit and failure to warn. The Court of Appeal stated: "The deployment of an air bag is, quite fortunately, not part of the 'everyday experience' of the consuming public. Minimum safety standards for air bags are not within the common knowledge of lay jurors. Jurors are in need of expert testimony to evaluate the risks and benefits of the challenged design. Even [the plaintiff's] own expert testified that in designing air bags there are tradeoffs involving complex technical issues." (*Id.* at pp. 1483-1484.) Hence, there was no basis for the trial court to conclude that ordinary consumer expectations had any place in the defect determination.

The *Soule* rules have also been applied in the asbestos context. (E.g., *Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 474-475 [38 Cal.Rptr.2d 739].) We find such authorities to be of limited value here due to the problem of comparing apples and oranges in such fact-specific circumstances.

██ The Restatement Third of Torts, Products Liability, section 2, page 14, sets forth this definition of manufacturing and design defects: "A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product: [¶] (a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product; [¶] (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe . . . ."[6] In comment (g) to this section, the reporters of the Restatement set forth these considerations about consumer expectations: "Under Subsection (b), consumer expectations do not constitute an independent standard for judging the defectiveness of product designs. Courts frequently rely, in part, on consumer expectations when discussing liability based on other theories of liability. Some courts, for example, use the term 'reasonable consumer expectations' as an equivalent of 'proof of a reasonable, safer design alternative,' since reasonable consumers have a right to expect product designs that conform to the reasonableness standard in Subsection (b). Other courts, allowing an inference of defect to be drawn when the incident is of a kind that ordinarily

---

[6]We omit here the additional definition regarding failure to warn of defects.

would occur as a result of product defect, observe that products that fail when put to their manifestly intended use disappoint reasonable consumer expectations. [Citation.] However, consumer expectations do not play a determinative role in determining defectiveness. . . . [¶] Subsection (b) likewise rejects conformance to consumer expectations as a defense. The mere fact that a risk presented by a product design is open and obvious, or generally known, and that the product thus satisfies expectations, does not prevent a finding that the design is defective. But the fact that a product design meets consumer expectations may substantially influence or even be ultimately determinative on risk-utility balancing in judging whether the omission of a proposed alternative design renders the product not reasonably safe. It follows that, while disappointment of consumer expectations may not serve as an independent basis for allowing recovery under Subsection (b), neither may conformance with consumer expectations serve as an independent basis for denying recovery. Such expectations may be relevant in both contexts, but in neither are they controlling." (Rest.3d Torts, § 2, com. (g), pp. 27-28.)

### B. *Terms of the Order*

To explain its reasoning, the coordination court relied on *Barker, supra,* 20 Cal.3d 413, and *Soule, supra,* 8 Cal.4th 548, to state that when a complex product, even when being used as intended, causes unexpected injury, the ordinary consumers' reasonable minimum assumptions about safe performance may not necessarily have been engaged. (8 Cal.4th at p. 567.) As noted by the court in *Soule*, "the ordinary consumer of an automobile simply has 'no idea' how it should perform in all foreseeable situations, *or how safe it should be made against all foreseeable hazards. . . . ,*" (*ibid.,* italics added) and accordingly, the consumer expectations test will be reserved "for cases in which the *everyday experience* of the product's users permits a conclusion that the product's design violated minimum safety assumptions, and is thus defective regardless of expert opinion about the merits of the design." (*Ibid.,* some italics omitted.)

The coordination court then agreed with the position taken by Defendants here: "If this case were about the failure of a rubber glove to offer barrier protection, Plaintiffs might have an argument that the consumer expectations test should be given some consideration by the Court." The court then reasoned, "However, it is clear from the litigation which has been ongoing for the last few years that it is not. *Rather, this litigation is about the complicated nature of rubber itself—and about the allergenic proteins that are naturally found in that substance. The litigation is about what rubber glove manufacturers knew about allergenic proteins; what they could have done*

*about them, the cost of doing it wrong, and when manufacturing changes were feasible* in light of the imperatives of the HIV/AIDS crisis. The consumer expectations test cannot reasonably be applied to this litigation because the allergenicity of NRL [natural rubber latex] gloves is 'a matter beyond the common experience and understanding of [health care workers,] its ordinary users.' (Citing *Soule, supra,* at 568, fn. 5.)" (Italics added.) Thus, here, as in *Soule, supra,* 8 Cal.4th 548, 570, "[Plaintiffs'] theory of design defect [is] one of technical and mechanical detail. It [seeks] to examine the precise behavior of several obscure components [NRL gloves] under the complex circumstances of a particular [health care worker plaintiff]."

Accordingly, the coordination court ruled that the consumer expectations test of design defect "should not be applied to claims of allergic/anaphylactic reactions caused by proteins that are endemic to natural rubber latex gloves."

## C. *Threshold Issues*

We wish to clarify several points on the scope of this proceeding. Turning first to the issues encompassed by the pleadings, admittedly, there may be some variation among the causes of action alleged by these remaining Plaintiffs, because the record of these writ proceedings does not include copies of all the pleadings. However, it is not disputed that Plaintiffs generally allege that Defendants manufactured and distributed natural rubber latex gloves which contained chemical substances, including latex and/or other substances that were of a toxic nature independently or in combination with other such chemical substances, and these products caused injuries. It is alleged that the latex gloves were further defective due to a failure to warn that the gloves and their associated substances were highly toxic and "extremely dangerous to those that may have an allergic or chemical reaction to said product." Also, the product is alleged to have a cumulative increase in its hazardous and toxic effect with prolonged use, and to be highly toxic to those with allergic reactions. As stated in *Clark, supra*, 83 Cal.App.4th 1048, these claims go beyond allegations that latex in its natural state harmed the Plaintiffs, and seek to establish that some form of defect or contamination occurred in the manufacturing process and in some way caused the Plaintiffs' injuries.

The Plaintiffs' allegations attack the latex material of the gloves in at least two different ways. Their claims appear to overlap about whether the alleged defects in the material are attributable to design defects or manufacturing defects. (There is also a failure to warn component, not at issue here.) ■ Generally, a defect in manufacture is regarded as different from a defect in design: "The latter focuses upon whether the product was designed

to perform as safely as an ordinary consumer would expect or whether the risk of danger inherent in the design outweighed the benefits of the design. [Citations.] The former focuses on whether the particular product involved in the accident was manufactured in conformity with the manufacturer's design. [Citations.]" (*Dierks v. Mitsubishi Motors Corp.* (1989) 208 Cal.App.3d 352, 354-355 [256 Cal.Rptr. 230].)

However, a treatise writer (1 Shapo, The Law of Products Liability (3d ed. 1994) ¶ 9.01(2), pp. 9-5 to 9-6) explains: "One should emphasize, however, that the line between design and manufacturing defects is not necessarily a sharp one. This is clear when one considers that the choice of quality control techniques may determine the rate of metallurgical flaws, which ordinarily would be characterized as 'manufacturing defects' rather than design defects. One may note, moreover, that those kinds of entrepreneurial decisions are quite analogous to the sorts of choices that are made in selecting one product configuration or another on the basis of cost considerations."
■ Here, the Plaintiffs are alleging that the materials from which the latex gloves were made contained excessive amounts of latex rubber proteins close to the surface of the gloves, causing the Plaintiffs to become sensitized to them and to develop or to exacerbate an existing allergy. This theory of injury appears to have aspects common to both the design defect and manufacturing defect theories. At this point, however, the legal issues are well enough defined and there is enough of a record to determine the applicability of the consumer expectations test on design defect. Nothing we say here is intended to affect the viability of any design defect theory that the Plaintiffs may pursue under the alternative test stated in *Barker, supra,* 20 Cal.3d 413, that a product is defective if its design embodies " 'excessive preventable danger' " (*id.* at p. 430), unless "the benefits of the . . . design outweigh the risk of danger inherent in such design." (*Id.* at p. 432.)

Next, we agree with Baxter that the order under review does not address whether a design defect theory may proceed under a consumer expectations instruction as to the allegations that there were contaminants added to the latex mixture during processing. The trial court mentioned that issue as separate from the proteins issue in a preliminary oral argument session in which it permitted the parties to submit briefing before the *McGinnis* order was converted into a general order. There is no such distinction made in the actual order, however. Accordingly, we undertake to review only the actual order as issued (dealing with the inapplicability of the consumer expectations test of design defect to claims of allergic/anaphylactic reactions caused by proteins that are endemic to natural rubber latex gloves, and not addressing the contaminants argument).

Further, we are presented with several very broad design defects arguments. JJM alone has advanced the extreme position that latex gloves should

be categorically regarded as a prescription pharmaceutical product that falls within the exemption from strict liability for design defects set forth in *Brown v. Superior Court* (1988) 44 Cal.3d 1049 [245 Cal.Rptr. 412, 751 P.2d 470]. JJM bases this position on documents showing the extent of federal regulation of latex surgical and examining gloves, as shown in materials of which it requests judicial notice.[7] JJM then argues that federal conflict preemption applies, even though there is no express preemption, because of the highly regulated nature of the industry that produces latex surgical and examination gloves. (Judicial notice request by JJM, exhibits G-J; 21 U.S.C. § 360 et seq. [the 1976 Medical Devices Amendments to the Food, Drug and Cosmetics Act]; 21 U.S.C. § 360k(a).) Baxter and JJM then both argue that even if the federal preemption theory fails, public policy still indicates that the consumer expectations test for design defect should be ruled inapplicable to these claims against latex glove manufacturers and distributors. The reasons given for this argument are the regulated nature of the industry, and the problems inherent in a products liability claim, other than failure to warn, based on allergy to a natural substance. (See Annot., Products Liability: Strict Liability in Tort Where Injury Results From Allergenic (Side-effect) Reaction to Product (1973) 53 A.L.R.3d 298.)

We are not persuaded that there is any conflict preemption here of a state products liability cause of action regarding gloves that are commonly used by other types of healthcare professionals, as well as by the public which may make use of such products for other reasons. (*Collins v. Baxter Health-care Corp.* (D.N.J. 1996) 949 F.Supp. 1143.) The types of gloves that are the subject of this litigation need not be obtained through prescription by an intermediary medical professional, such as the prescription pharmaceutical products discussed in *Brown v. Superior Court, supra*, 44 Cal.3d 1049, or the implanted medical devices in cases such as *Hufft v. Horowitz* (1992) 4 Cal.App.4th 8, 18-19 [5 Cal.Rptr.2d 377] or *Artiglio v. Superior Court* (1994) 22 Cal.App.4th 1388, 1395-1396 [27 Cal.Rptr.2d 589]. We need not

---

[7]JJM submits in its return appendix Center for Disease Control recommendations for prevention of human immunodeficiency virus (HIV) transmission in health care settings, regarding the need for universal precautions against blood-borne pathogens. It also requests judicial notice of excerpts from titles 21 and 29 of the Code of Federal Regulations (C.F.R.), pertaining to quality system regulation for medical devices. It also submits for judicial notice excerpts from the legislative history of the Safe Medical Devices Act of 1990. Proposed regulations by the Food and Drug Administration (FDA) are submitted regarding the authority to recall medical devices. Finally, JJM submits excerpts from the Occupational Safety and Health Administration preamble in 29 C.F.R. section 1910.1030 (2000), regarding the need for safety precautions to minimize occupational exposure of health care workers to harmful organisms, including hepatitis B virus (HBV), HIV and other blood-borne pathogens. Although we grant the request to take judicial notice of these documents, we reject the JJM position that these documents support the position that this action is preempted by federal law.

further address the arguments presented regarding *Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470 [116 S.Ct. 2240, 135 L.Ed.2d 700] or *Buckman Company v. Plaintiffs Legal Committee* (2001) 531 U.S. 341 [121 S.Ct. 1012, 1017-1018, 148 L.Ed.2d 854], that state law design defect claims that are premised on the consumer expectations test would impermissibly conflict with the authority of the federal FDA to regulate medical products. Nor need we base our decision on public policy as represented by federal law, as the state law guidelines in the design defect strict liability field are sufficiently clear to guide us here, even in the allergy context.

### D. *Merits of the Order*

In light of the above considerations, we must restrict our scrutiny of the general order to (1) whether the particular circumstances of the alleged product failure would support application of the consumer expectations test from a lay perspective, to infer or determine that (2) the product's design performed below legitimate, commonly accepted minimum safety assumptions of its ordinary consumers. (*Soule, supra,* 8 Cal.4th 548, 569.) Is the alleged defect readily apparent to the common reason, experience, and understanding of the product's ordinary consumers? (*Ibid.*)

We are presented with the special problem here of reconciling products liability law that has developed in the context of merchandise, such as soda bottles and automobiles, with the body of knowledge that deals with medical and allergic conditions and their genesis. These different factual contexts intersect only with difficulty. As the issues are presented here, we must analyze the two portions of this test with an eye to the complexity of the determinations required for each part, i.e., whether expert testimony is necessary to assist the trier of fact in drawing appropriately focused conclusions. We should initially note that *Soule, supra,* 8 Cal.4th 548, does not establish any bright-line rule for the use of this test, only shades of gray. Specifically, the court in *Soule* rejected a categorical claim by the manufacturer-defendant that the consumer expectations test is per se inapplicable whenever a very complex product, technical questions of causation, or automobile "crashworthiness" are at issue. The court reasoned, "Because the variety of potential product injuries is infinite, the line cannot be drawn as clearly as [the manufacturer] proposes." (*Id.* at pp. 568-569.) Instead, the focus must be upon the circumstances of the product's failure, for purposes of analyzing the performance of the product with respect to consumer expectations.

Before we focus on the nature of Plaintiffs' "legitimate, commonly accepted minimum safety assumptions" (*Soule, supra,* 8 Cal.4th 548, 569), we

must acknowledge that the particular circumstances of the product's failure, as alleged here, are far from simple. Under *Soule* the consumer expectations test can be applied even to very complex products, but only where the circumstances of the product's failure are relatively straightforward. The court gave examples of extreme and simple situations that would allow the clear applicability of the consumer expectations test (product failures such as automobiles that explode while idling at a stoplight or roll over and catch fire in a two-mile-per-hour collision) (*id.* at pp. 566-567, fn. 3).

But here, the alleged circumstances of the product's failure involve technical and mechanical details about the operation of the manufacturing process, and then the effect of the product upon an individual plaintiff's health. Plaintiffs' main contention is that each of them had either a nonexistent, minor, or dormant allergic condition, which was triggered into a harmful condition by the degree of usage or exposure to latex gloves manufactured by Defendants. Plaintiffs claim that they did not become symptomatic of allergies to latex until there was significant exposure to latex in the form of glove usage. It is the intensity or degree of exposure to the allergenic substance upon which they rely for their design defect theory. We reiterate here that this dispute over the usage of the consumer expectations test does not involve any alternative theory that there are contaminants or foreign substances in the manufacture of the gloves that caused them harm. We express no opinion on that latter question, which is not now before us.

Thus, the alleged circumstances of the product's failure evidently will be addressed through medical testimony regarding the Plaintiffs' assumptions that they had some initial level of sensitization, which then became worse and reached the claimed level of injury from their usage of the product. Similarly, expert testimony will likely be presented on the relationship of the manufacturing methods used and the treatment and alteration of the raw material from which gloves are made.

The other portion of the consumer expectations test requires similarly complex analysis. Our main task is to clarify what definitions Plaintiffs are attributing to their "legitimate, commonly accepted minimum safety assumptions" as ordinary consumers. (*Soule, supra,* 8 Cal.4th 548, 569.) They are claiming that from a lay perspective, they could reasonably infer that the product's design performed below such standards, and was defective, and the jury should be so instructed.

There are several problems with this argument. First, the latex gloves were normally used by Plaintiffs, medical professionals, as a safety measure

designed to protect an individual from harm, to the extent that such a barrier against infection and foreign substances can do so. At oral argument, Plaintiffs' counsel clarified that the consumer expectation was generally that Plaintiffs would not sustain injury from wearing or being around those who were wearing latex gloves, in the context of normal professional usage. Plaintiffs view the product as a simple one that can give rise to simple consumer expectations of safety that have nothing to do with the chemical composition of the material from which the product is manufactured, or any other design characteristics for which specialized knowledge is required for understanding or taking appropriate precautions.

However, the protective or barrier function of the latex gloves, on which the Plaintiffs' safety argument is mainly premised, is not their only characteristic. These gloves are made of a particular material through a particular manufacturing process. The effect of this material and these processes may well be to create in their users many degrees of allergic reactions. Understanding and assessing responsibility for such allergic reactions is a matter that is driven by the science of the manufacturing and preparation procedures, as well as the medical aspects of an individual's allergic reactions to various substances.

Plaintiffs' theory of design defect, therefore, is a complex one. When we reformulate the Plaintiffs' underlying consumer expectations statements to comport with their actual arguments in these proceedings, we see that their simple formulation of an expectation that they would not be harmed by the use of this product is totally inaccurate. Rather, their arguments posit that exposure to the natural substance of latex may make their dormant, incipient, or developing allergies worse than they would otherwise have been. We find it an inevitable conclusion that before the issues of design defect can be adequately litigated and resolved, expert testimony will be essential to assist the finder of fact in understanding the pros and cons of Plaintiffs' arguments.

In other words, the actual expectations of these Plaintiffs as users or consumers of the gloves include many assumptions about the mechanism of injury and the mechanisms of production of the product, with respect to their claims of legally cognizable injuries. Plaintiffs nevertheless argue that the coordination court erred in focusing on the allergenicity of latex gloves, rather than focusing on the overall product performance in terms of a basic safety measure (gloves are a protective device). We find their arguments to be materially inconsistent with their complex and technical approach to proving the alleged design defect, as summarized above.

However, we disagree with Defendants that the development of this type of allergy should be deemed to be an expected or obvious event, based on the showing there was a 1991 FDA medical alert to healthcare professionals about the growing problem of latex allergies. (FDA Medical Alert, March 29, 1991, Allergic Reactions to Latex-Containing Medical Devices.) Defendants apparently seek to show that the consumer expectations test must be inappropriate because these gloves do not have obvious defects that defeat the purpose of the product as to the majority of users (analogous to an exploding car at a stoplight). (*Soule, supra,* 8 Cal.4th at pp. 566-567, fn. 3.) However, it has not yet been determined which of these plaintiffs learned about the 1991 FDA alert or when they did so, and this approach gets us nowhere on the allergy question.

Further, the views set forth in *Clark, supra,* 83 Cal.App.4th at pages 1059-1060, support our conclusion that the consumer expectations test would be inappropriately applied at trial here. "The record could support an inference that [the plaintiff] did not become aware of a potential wrongfulness component of her cause of action until more information than the existence of her allergies placed her on inquiry notice and then was actually gained." (*Id.* at p. 1060.) Also, the allegations in *Clark* were that there may have been a negligent cause of the injuries, because the latex gloves supplied may have caused her to develop " 'severe illnesses and injuries to the skin, including but not limited to skin discoloration, soreness, rashes, respiratory and/or other related diseases, disorders and reactions caused by extended exposure to the chemical substances contained in Defendants' product.' " (*Id.* at pp. 1058-1059.) Plaintiffs are seeking to prove that their conditions were caused by more than a natural allergy to a natural substance, such that a product defect or a wrongdoing by a defendant could have been causative factors. The complexity of this task makes it inappropriate to apply the consumer expectations test for design defect.

We are also supported in this conclusion by the narrow view of the use of the consumer expectations test set forth in the Restatement Third of Torts, Products Liability, section 2, comment (g), pages 27-28. Such expectations do not constitute an independent basis for judging the defectiveness of a product's design, and thus do not ordinarily play a determinative role in determining defectiveness. However, they can be taken into account when determining if there is a basis for allowing recovery under a design defect theory that includes a risk-benefit analysis. (Rest.3d Torts, § 2, com. (g), pp. 27-28.) In California, this test must always be read subject to the views of

*Soule, supra,* 8 Cal.4th 548, regarding the extreme type of product failure that may readily be evaluated by lay persons. (*Id.* at pp. 566-567, fn. 3).[8]

Just as the Supreme Court in *Soule, supra,* 8 Cal.4th at page 560 noted that traffic accidents are foreseeable, and collision safety is an important design consideration, so too must the potential allergic reactions of a user of these gloves bear upon the duties of a manufacturer or designer of the product. This is the opposite side of the coin from the Plaintiffs' actual, unspoken consumer expectations of safety, as affected by use of the latex gloves by themselves or others. The clear trend of authority allows for the application of scientific understanding and analysis in the products liability context, and this is particularly so where there are allegations of allergic and/or idiosyncratic reactions to the product that is allegedly defective in design. The complex nature of the design defects alleged here requires such scientific resources to achieve a just resolution of the controversy by the finder of fact.

Accordingly, on this record, the alleged design defects cannot correctly be evaluated under the reformulated consumer expectations test as limited by *Soule, supra,* 8 Cal.4th 548. The alleged creation or exacerbation of allergies by a product, such as by the presence of certain levels of proteins on the surface of latex gloves, to which the user is exposed, are not subjects of commonly accepted minimum safety assumptions of an ordinary consumer. (*Id.* at p. 569.)

In conclusion, we decide only the issue presented. The trial court did not err in issuing the general order precluding the Plaintiffs from relying on the consumer expectations test in pursuing their theory of design defect.

### DISPOSITION

The petition is denied. Each party to bear its own costs.

Kremer, P. J., and Nares, J., concurred.

Petitioners' petition for review by the Supreme Court was denied October 10, 2001. George, C. J., Werdegar, J., and Chin, J., did not participate therein.

---

[8]We are not dealing here with products liability case law in the failure to warn area; see, e.g., *Livingston v. Marie Callenders, Inc.* (1999) 72 Cal.App.4th 830, 835-841 [85 Cal.Rptr.2d 528].