[No. A035546. First Dist., Div. Two. Mar. 1, 1989.]

RICHARD D. DIERKS et al., Plaintiffs and Appellants, v. MITSUBISHI MOTORS CORPORATION et al., Defendants and Respondents.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication with the exception of parts I B, C, D, E, II and III.

**COUNSEL**

Salvador A. Liccardo, Robert A. Franklin and Caputo, Liccardo, Rossi, Sturges & McNeil for Plaintiffs and Appellants.

Peter W. Davis, Patrick J. Becherer, James C. Martin, Crosby, Heafey, Roach & May and Martin Snyder for Defendants and Respondents.

**OPINION**

**POLLAK, J.**[*]—Appellants were severely injured when the vehicle in which they were traveling rolled over in a tragic mishap on Highway 101. They appeal from the judgment entered in favor of the manufacturer, distributor and retail vendor of the car in which they were riding, following a jury's special verdict that there was no defect in the design of the vehicle and that respondents were not negligent in testing the roof of the car, as

---

[*] Assigned by the Chairperson of the Judicial Council.

appellants had alleged. Appellants assert errors by the trial court in refusing to instruct on additional theories of recovery, in admitting certain evidence, and in refusing to grant a judgment notwithstanding the verdict because of insufficiency of the evidence. Finding no such errors, we affirm the judgment.

On August 7, 1982, the two appellants were passengers in a 1976 Dodge Colt designed and manufactured by respondent Mitsubishi Motors Corporation, distributed by respondent Chrysler Corporation and sold by respondent Hub City Dodge. While driving on Highway 101 in San Luis Obispo County, the driver of the vehicle swerved onto the unpaved median divider, lost control of the vehicle and the car rolled over once. As a result of the rollover, the vehicle's roof crushed inward on the right side of the vehicle where both appellants were sitting, one in the front and the other in the rear. As a result of the accident, both appellants were rendered quadriplegic or near quadriplegic.

Appellants' original complaint alleged 16 causes of action against respondents and against other defendants with whom settlements subsequently were reached. The case went to the jury on two theories—strict liability based on an alleged defect in the design of the roof of the vehicle, assertedly rendering the automobile uncrashworthy, and the asserted negligent failure adequately to test the roof strength of this design. Although substantial evidence was presented from which a jury might have found in appellants' favor, the jury found against them on both theories.

## I.

The trial court refused to submit instructions on several additional theories, and this failure underlies appellants' principal attack on the judgment below. ▪ If the record contains substantial evidence that would have justified recovery on the alternative theories, the failure to have included the additional instructions would have been erroneous. (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 543-544 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158]; *Lunghi* v. *Clark Equipment Co.* (1984) 153 Cal.App.3d 485, 493 [200 Cal.Rptr. 387].)

### A.   *There was no evidence of a manufacturing defect.*

▪ Appellants complain first of the trial court's refusal to instruct on theories of strict liability and negligence for a defect in the manufacture of the specific vehicle involved in the accident.[1] ▪ A defect in manufacture is, of course, quite different from a defect in design. The latter focuses

---

[1]BAJI No. 9.00.3, one of the rejected instructions, reads in part: "A defect in the manufacture of a product exists if the product differs from the manufacturer's intended result or if the product differs from apparently identical products from the same manufacturer."

upon whether the product was designed to perform as safely as an ordinary consumer would expect or whether the risk of danger inherent in the design outweighed the benefits of the design. (See, e.g., BAJI No. 9.00.5; *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) The former focuses on whether the particular product involved in the accident was manufactured in conformity with the manufacturer's design. (BAJI No. 9.00.3; *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153].)

Appellants assert that their evidence demonstrated defects in both design and manufacture, citing portions of the testimony in which their experts assertedly testified to deficiencies in the manner in which the "windshield header"[2] was attached to the roof of the car, to the failure adequately to "box" all of the roof "stiffeners,"[3] and to the failure properly to bond the windshield to the windshield header.

However, in his opening statement to the jury, appellants' counsel made clear that he was seeking to prove only design defects and the failure adequately to test the roof strength.[4] Appellants' evidence was limited to the issues focused upon during the opening statement. A review of the record, with particular attention upon the testimony from which the excerpts cited by appellants in their brief were taken, leaves no doubt that the witnesses at all times were referring to asserted deficiencies in the design of the Colt; there was never any suggestion that the particular vehicle in which appellants were injured was manufactured differently from the prototype.[5]

---

[2] The pillars of an automobile are pieces of sheet metal extending up from the body of the car toward the roof. The pillar closest to the front of the car is called the "A" pillar and the pillar closest to the rear of the car is called the "C" pillar. Running between the "A" pillars across the front of the vehicle is the "windshield header." The side rails run from the "A" to the "C" pillars on both sides of the car, and the rear windshield header runs between the two "C" pillars at the rear of the car.

[3] A "stiffener" is a thicker piece of sheet metal than the roof panel, or several pieces of sheet metal welded together, which are placed around the edges of the roof and pillars. The structural members are given some cross-sectional area, or "boxed," for depth and strength. To provide more strength, all of the ends of the member are tied together. Increasing the depth given to the box also increases the strength.

[4] According to appellants' counsel in his opening statement to the jury: "Now, what are basically the issues as to this Colt? As you already know, obviously that the roof wasn't designed strong enough to withstand a single low speed rollover. . . . [¶] . . . Then there will be testimony by other experts dealing with some other issues in the case . . . . Now, it's our contention that not only is it defectively designed obviously and too weak, but it was defectively tested and negligently tested." At no point did appellants' counsel refer to any other theory.

[5] For example, appellants refer to the testimony of their expert, Dr. Michael Kaplan, as supposedly evidencing a manufacturing defect in failing to spot weld in the area in which the roof failed, quoting the following testimony of Dr. Kaplan: "There are no spot-welds over here. It's not welded to the roof. [¶] What they have done is they have taken this plastic type material and kind of glued it along here and not everywhere. You see the glue line stops right here and there is nothing beyond it." However, in so testifying, Dr. Kaplan was referring to

Appellants' contention that the jury should nonetheless have been permitted to interpret the evidence (presumably aided by the arguments of counsel) as establishing a deviation in the roof of the accident vehicle from the manufacturer's specifications, or negligence in the manufacture of the car, thus fails for at least two reasons. First, as indicated (see fn. 5, *ante*), there simply was no substantial evidence that the particular car was manufactured negligently or in nonconformity with the specifications or with other apparently identical Dodge Colts. Absent such supporting evidence, no such instructions were proper. (*Levy-Zentner Co.* v. *Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 783 [142 Cal.Rptr. 1].)

Secondly, for some seven weeks appellants tried their case exclusively on the theories that the design of the vehicle was defective and was negligently tested. Counsel never suggested that appellants' expert testimony was intended to establish a manufacturing defect. The experts themselves expressed no such opinion. In fashioning instructions, the trial court was not required to second-guess the experts by determining if the facts on which they relied would have supported some alternative but unexpressed theory of liability.

*Endicott* v. *Nissan Motor Corp.* (1977) 73 Cal.App.3d 917 [141 Cal.Rptr. 95, 9 A.L.R.4th 481] involved a comparable situation. Plaintiff there unsuccessfully sought damages for injuries allegedly resulting from the rupture of a lap seat belt plaintiff was utilizing when an accident occurred. Plaintiff offered no evidence that the seat belt failed to meet the standards of safety provided by California Vehicle Code section 27300, and the trial court refused to instruct on a negligence per se theory for alleged violation of the statute. The appellate court affirmed, holding that "[s]uch an instruction

---

portions of a roof of a 1976 Dodge Colt that was found in a wrecking yard, and not to the car involved in the accident. In context, it is clear that Dr. Kaplan was describing what he considered to be a defect in the design of all such Dodge Colts. The line of testimony in which this particular response was given began with the following questions: "In examining the roof design, in your opinion, is that a good design?" and, after Dr. Kaplan answered, "No, it's not," "Why not, Dr. Kaplan?" A recess was taken shortly after Dr. Kaplan gave the answer just quoted, and the opening question to him after the recess was the following: "Would you continue with your opinion, Dr. Kaplan, of why you feel the roof design was inadequate in this car?"

Similarly, in testifying that a certain photograph showed "where the front windshield header pulled away in the subject accident where it was merely just glued rather than welded," also cited by appellants as evidence of a manufacturing defect, Dr. Kaplan was elaborating upon his immediately preceding answer in which he remarked, after being asked to explain his opinion as to the mechanism of the failure of the roof, that he had "already talked about how it was designed and things I don't like about the design. It failed in this accident as a direct result of the design . . ." and shortly thereafter went on to answer the following question: "Would you explain to the jury in a general sense what would be your opinion as to how this roof should have been designed to prevent happening what happened here, the crushing?" Dr. Kaplan never suggested that the use of glue rather than a weld was a departure from the manufacturer's design; rather, that was one of the asserted defects in the design to which he testified.

was unwarranted in that plaintiff failed to offer any evidence that the design of the seat belt violated the statute." (*Id.,* at p. 928.) The appellate court also noted that plaintiff's action was "neither pleaded nor tried as a negligence action," and that defendants would have been prejudiced by permitting plaintiff "to shift to a negligence theory between close of trial and submission to jury . . . ." (*Id.,* at p. 929.)

In *Endicott,* the potential prejudice arose from the fact that defendants could have urged plaintiff's contributory negligence as a defense to a negligence claim, but the defense was not then available in a product liability case.[6] Here, despite the breadth of the complaint, appellants presented and respondents defended a case in which the relevant testimony and expert opinion related exclusively to an asserted defect in design. Respondents had no reason to present evidence to show that the design standards had been followed in manufacturing the accident car, or to show that the vehicle was not negligently manufactured, and they did not attempt to do so. Had the trial court acceded to appellants' request for additional instructions, respondents would have been required to defend against theories of liability articulated for the first time after the close of evidence. As in *Endicott,* the trial court correctly refused to permit such potential prejudice.

Thus, the trial court properly rejected the proffered instructions concerning a defect and negligence in manufacture.

. . . . . . . . . . . . . . . . . . .*

## IV.

The judgment is affirmed.

Kline, P. J., and Peterson, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 18, 1989.

---

[6]See *Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725 [144 Cal.Rptr. 380, 575 P.2d 1162], decided after *Endicott,* extending comparative fault principles of *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] to strict product liability.

*See footnote, *ante,* page 352.