Filed 10/4/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DANIEL KRUTHANOOCH, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> GLENDALE ADVENTIST MEDICAL CENTER, <br><br> Defendant and Appellant. | B306423 <br><br> Los Angeles County <br> Super. Ct. No. BC692929 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Christopher K. Lui, Judge. Affirmed.

Doyle Law, Conal Doyle; Seber Bulger and James Bulger for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza, Cassidy C. Davenport; Reback, McAndrews, Blessey, Raymond L. Blessey and Evan N. Okamura for Defendant and Appellant.

Tucker Ellis and Traci L. Shafroth for California Medical Association, California Dental Association, and California Hospital Association as Amici Curiae on behalf of Defendant and Appellant.

## INTRODUCTION

The Estate of Nick Kruthanooch (the Estate), by and through plaintiff and successor in interest Daniel Kruthanooch, appeals from the judgment after the trial court granted the motion for judgment notwithstanding the verdict in favor of the defendant, Glendale Adventist Medical Center (GAMC), following a jury trial of the Estate's claim of neglect under the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.)[1] (the Act).  Nick Kruthanooch (Kruthanooch), the decedent, presented at the acute care hospital operated by GAMC with complaints of weakness and lightheadedness.  Several hours later, Kruthanooch underwent a magnetic resonance imaging (MRI) scan and sustained a burn to his abdomen due to GAMC's failure to screen Kruthanooch for electrically conductive materials prior to the scan.  Kruthanooch was discharged two days later.

The court concluded that substantial evidence failed to support that GAMC had a substantial caretaking or custodial relationship with Kruthanooch, a prerequisite for recovery for neglect under the Act as discussed in *Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148 (*Winn*).  The court also concluded that substantial evidence failed to support that GAMC's conduct in failing to properly screen Kruthanooch was neglect under the Act because it arose not from a failure to provide medical care but from the negligent provision of care.

We hold that the court was correct on both grounds.  We decline to reach the issue of whether GAMC's conduct was

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

reckless and the additional issues raised by GAMC in its protective cross-appeal.

## FACTS AND PROCEDURAL BACKGROUND

On July 26, 2016, Kruthanooch presented at GAMC's emergency department at approximately 2:30 p.m. Dr. Harlan Gibbs and registered nurse Courtney Ulrich assumed care for Kruthanooch. Kruthanooch had a history of coronary artery disease, hypertension, hyperlipidemia, and diabetes. He had also had back surgery earlier that year. According to the emergency department report, Kruthanooch came for evaluation because he "woke up weaker than usual." Kruthanooch was experiencing generalized weakness, which was worse in his lower extremities, as well as lightheadedness for the prior 24 hours. However, Kruthanooch was alert, "oriented to person, place, time, and situation," and cooperative.

Shortly after his arrival, Dr. Gibbs ordered an electrocardiogram (ECG) for Kruthanooch. "Medi-Trace" brand ECG (or EKG) pads were placed on Kruthanooch. Dr. Gibbs then sent Kruthanooch for an MRI of his spine in order to rule out spinal cord compression. The date and time listed for the exam on the MRI report was 4:55 p.m.

Ulrich testified that she did not remember anything from her encounter with Kruthanooch before his MRI and did not remember sending him for the MRI. However, she testified that in 2016, after a doctor ordered an MRI, she would go through an MRI checklist with the patient and would provide the checklist to the transporter, who would deliver the patient to the MRI department. When screening a patient before an MRI in 2016, Ulrich did not look for ECG pads.

3

Ilan Davoodian was the MRI technologist who performed Kruthanooch's MRI. In 2016, Davoodian had not received training regarding the dangers of ECG pads in an MRI machine and did not screen patients for ECG pads. However, Davoodian would screen patients with a computerized system to see whether prior imaging had been done on the patient, used a metal detector to detect potentially harmful metals, and went through a questionnaire with the patient.

Davoodian conducted a scan for metal on Kruthanooch and spoke with him for approximately ten minutes to obtain his medical history before conducting the MRI scan. After she started the scan, Davoodian noticed motion in the image and stopped the scan and asked Kruthanooch not to move as it was impacting the image. Kruthanooch replied that he would not move, but shortly thereafter he moved again. Davoodian again asked that he remain still so they could get a clear image and Kruthanooch agreed. After the scan was completed, Davoodian provided it to the radiologist, Dr. Judy Liu, who interpreted the image.

When Kruthanooch was returned to the emergency department, he informed Ulrich that "something was going on with his lower abdomen." Ulrich did not recall whether she removed the ECG pad or a doctor did, but she was present when they discovered the burn on Kruthanooch's abdomen. According to Ulrich, "[i]t looked like a blister or second-degree burn." She did not recall Kruthanooch saying he was in pain, but that he "pointed and said something happened here." Ulrich reported the burn to the charge nurse, reached out to the technologist to determine what happened, noted the burn in Kruthanooch's medical chart, and photographed it.

Dr. Gibbs' reexamination and reevaluation notes in Kruthanooch's emergency department report, signed at 7:21 p.m., state: "No evidence of cauda equina. I cannot explain the lower extremity weakness essentially inability to ambulate at this time. He has a baseline creatinine according to his history from 2 weeks ago for approximately 2. His renal function now is remarkably worse. This along with rhabdomyolysis. Could this be an underlying muscle disorder? In any case he will require hydration for the rhabdomyolysis. He'll require admission. . . . [¶] While an [*sic*] MRI apparently the EKG electrode was not removed and the patient sustained a second degree burn to the left lower quadrant."

At some point on July 26, Kruthanooch was admitted as an inpatient to the telemetry unit, in which patients receive 24-hour cardiac monitoring. The emergency department report states that admitting orders were requested at 6:48 p.m., and at 7:21 p.m. Dr. Gibbs noted that Kruthanooch "required admission to telemetry for further care and treatment." Ulrich testified that it was her understanding that Kruthanooch was an inpatient of the hospital, though it is unclear what timeline she was referring to.

During his stay in the hospital, Kruthanooch was started on aggressive intravenous (IV) fluid hydration and was referred to nephrology for his underlying kidney issues. He was also evaluated by a physical therapist and recommended a walker and home physical therapy. On July 28, 2016, Kruthanooch was discharged. His discharge diagnosis noted that Kruthanooch would have to continue IV fluid hydration and resuscitation to address both his dehydration and his rhabdomyolysis. He was also diagnosed with acute on chronic renal failure, hypertension, type 2 diabetes, "mildly elevated troponin in the setting of acute

kidney injury," chronic anemia, DVT prophylaxis, and adult failure to thrive. A home health consult was ordered on July 28 to change the dressing on Kruthanooch's burn and to apply medication. GAMC treated Kruthanooch's burn on an outpatient basis for approximately seven weeks.

On February 2, 2018, Kruthanooch filed a civil complaint against GAMC, asserting causes of action for: (1) professional negligence, (2) elder abuse, and (3) elder abuse per se.[2] On November 18, 2018, Kruthanooch died. The Estate was substituted in as plaintiff shortly thereafter. In the operative first amended complaint, the Estate dropped the professional negligence cause of action and added a claim for punitive damages. The claims arose from the burn that Kruthanooch sustained in the MRI machine.

The trial was held in November 2019. In addition to testimony from GAMC employees Ulrich and Davoodian, the jury heard testimony from Rafael Rodriguez, the "unofficial MRI safety officer" for GAMC. Rodriguez was responsible for MRI safety at the hospital and assisted the hospital with following guidelines from accredited institutions. Rodriguez testified that it was most important to screen for ferromagnetic metal, which has "attractive properties when it's close to a magnetic field," because those metals "present[] a significant danger or threat to the patient, and that's what we're trained for." The metal detector used by the MRI technologists detected ferromagnetic metals. Rodriguez testified that he understood that there could

---

[2] Kruthanooch also brought claims against Adventist Health System/West but the Estate dismissed those claims with prejudice prior to trial.

be electrically conductive materials that were not ferromagnetic, but was not aware at the time of the incident that the ECG pads fell into that category. Rather, Rodriguez did not believe that putting a patient in the MRI machine with ECG pads was dangerous based on his experience in different hospitals, his training, and "scanning hundreds of patients" with the ECG pads on. Before Kruthanooch was injured, it was standard practice at GAMC to allow ECG pads to remain on a patient undergoing an MRI scan. In response to Kruthanooch's injury, GAMC changed its policy and began to require that MRI technologists remove ECG pads before scans.

The Estate introduced expert testimony from Dr. Jeffrey Silverman, a specialist in diagnostic radiology. Dr. Silverman opined that GAMC's screening process before Kruthanooch underwent the MRI scan was not consistent with the standard of care in radiology. He testified that the basic rule, known "everywhere," is that "one never puts any item into the MR machine environment . . . unless the item is unequivocally known to be MR safe or MR conditional." Dr. Silverman testified that he believed that the hospital had failed to train its employees properly and that they deviated from the industry standard practice by failing to have a policy to screen for and remove ECG pads that are not safe for use in MRI machines.

GAMC introduced the expert testimony of Dr. Terry Dubrow, a specialist in reconstructive plastic surgery. Dr. Dubrow opined that the performance of the MRI with ECG pads was consistent with the manner that MRIs are performed in outpatient surgery centers and hospitals and thus within the standard of care. Dr. Dubrow also opined that the metal in the ECG pads did not cause Kruthanooch's burn. He testified that

7

the actual cause was "unknowable," but that Kruthanooch was "very, very ill" and that anything from "fluid status changes" to something on the surface of Kruthanooch's skin could have been the cause.

The jury also heard testimony from Daniel and Sam Kruthanooch, the decedent's sons.[3] Sam testified that he had advised Kruthanooch to go to the hospital when his father informed him that he was feeling weak. When he visited his father that evening, he learned of the burn. He testified that the burn "seemed to affect his walking immediately." Sam testified that, prior to the burn, Kruthanooch "did everything on his own," and that after the burn he relied on his wife "to do just about everything for him," such as helping him to move about the house, helping him to shower and use the bathroom, cooking his meals, and doing the shopping—things that Kruthanooch had previously handled on his own. Sam recognized that his father "had a lot of health problems" but testified that "the burn just made those things much worse." Daniel testified that, prior to receiving the burn, Kruthanooch was "very independent" and was "up and adam [*sic*] . . . a go-getter . . . and he did everything himself." After the burn, Daniel testified that Kruthanooch was "a different person," "couldn't get up," and "couldn't do stuff on his own."

The jury concluded that Kruthanooch was 65 years of age or older, that GAMC had care or custody of Kruthanooch, that one or more of GAMC's employees failed to use the degree of care that a reasonable person in the same situation would have used

---

[3] The decedent and his sons share the same last name. We refer to his sons by their first names to avoid confusion. We intend no disrespect.

in providing care, and that this conduct was a substantial factor in causing harm to Kruthanooch.  The jury also concluded that the Estate had proved recklessness, oppression, or malice by clear and convincing evidence and that an officer, director or managing agent of GAMC had authorized this conduct.  However, the jury awarded no damages.

The court entered judgment on January 15, 2020, and GAMC timely moved for judgment notwithstanding the verdict (JNOV).  GAMC argued that there was no substantial evidence that GAMC had care or custody of Kruthanooch at the time of the MRI scan, and no substantial evidence that it had committed elder neglect in the absence of substantial evidence that it had failed to provide medical care or that it failed to protect Kruthanooch from health and safety hazards.  GAMC also argued that there was no substantial evidence supporting the heightened elder abuse remedies because there was no substantial evidence of recklessness or that Davoodian was an unfit employee or that GAMC ratified her conduct.

The court granted the motion and entered judgment for GAMC.  The court concluded that "the evidence at trial established that decedent presented at the emergency room seeking treatment, and that the health care providers in the emergency room issued orders for treatment and diagnostic testing as indicated by decedent's complaints.  Nothing in the evidence at trial established that decedent went to the hospital seeking a greater degree of care or assistance beyond medical treatment to address his complaints, or that GAMC offered or promised decedent anything other than medical care that would correspond to his complaints in the context of an emergency room."  Accordingly, "[t]he evidence at trial did not show that a

relationship deeper than an ordinary patient-provider relationship was either sought by decedent or offered by GAMC. Thus, no 'care or custody' relationship has been established for purposes of the Elder Abuse Act."

The court also agreed that no substantial evidence supported "that GAMC either failed to provide medical care, or that it failed to protect decedent from health and safety hazards." The court concluded that the injury that Kruthanooch suffered was not the result of "a failure to provide medical care that would fall within the scope of the Elder Abuse Act—it is a complaint that treatment actually provided was poorly performed, i.e., a claim for professional negligence." Further, "while the evidence may have shown that GAMC's manner of administering the MRI may have fallen below the reasonable standard of care, finding that the delivery of substandard medical treatment in a hospital setting is elder abuse would run afoul of the *Winn* principle that a patient's elder status alone does not trigger the Elder Abuse Act."

The court also concluded that substantial evidence did not support the jury's finding of recklessness under the Act. The court observed that recklessness requires that the plaintiff establish "that 'the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice.'" The court determined that Rodriguez's and Davoodian's belief that it was safe to allow ECG pads in the MRI machine did "not show subjective knowledge of a high degree of risk." The court stated that Dr. Silverman's testimony merely

10

established the objective standard, rather than the subjective beliefs of GAMC's employees, and that his description of GAMC's conduct as "reckless" was an extemporaneous rather than legal use of the term. The court concluded that GAMC's remaining contention "that GAMC did not authorize or ratify the conduct of the MRI technician Ms. Davoodian" was moot in light of its finding that recklessness was not established.

The Estate timely appealed.

## **CONTENTIONS**

The Estate contends that the court improperly ignored substantial evidence in concluding that GAMC did not have care or custody of Kruthanooch as a matter of law and disregarded the issue of whether GAMC failed to protect Kruthanooch from health and safety hazards in concluding that GAMC did not commit neglect under the Act. Similarly, the Estate argues that the court ignored evidence of institutional recklessness and improperly drew inferences against the Estate with respect to the credibility of witnesses.

GAMC argues that the court correctly concluded that the evidence supported that the relationship between GAMC and Kruthanooch was that of healthcare provider and patient only and that the substandard provision of medical care cannot sustain a claim of neglect under the Act. GAMC also contends that the court correctly focused its analysis on the subjective knowledge of GAMC's employees and that the JNOV should be affirmed on the independent basis that the Estate did not prove by clear and convincing evidence that an officer, director, or managing agent of GAMC authorized or ratified any wrongful conduct. In its protective cross-appeal, GAMC argues that the verdict was not supported by clear and convincing evidence of

11

corporate authorization or ratification and that the Estate is not entitled to enhanced remedies in the absence of an award of damages.

GAMC's amici curiae, California Medical Association, California Dental Association, and California Hospital Association, contend that, if we conclude that neglect under the Act applies to alleged omissions by health care providers while providing medical care, we will undermine the goals of the Act and the statutory regime governing professional negligence claims. Accordingly, the amici urge us to conclude that the negligent provision of medical services must be evaluated as professional negligence, not as elder neglect under the Act.

## DISCUSSION

We agree with GAMC and its amici curiae that, at its core, this action concerns professional negligence and is therefore incompatible with a claim of neglect under the Act. We hold that the court correctly ruled that substantial evidence does not support that a robust caretaking or custodial relationship existed between Kruthanooch and GAMC. We further conclude that GAMC's conduct in failing to properly screen Kruthanooch prior to the MRI is not neglect under the Act as a matter of law. Accordingly, we affirm without reaching the remaining issues raised on appeal.

## 1.    Standard of Review

" ' "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.] [¶] . . . As in the trial court, the standard of review [on appeal] is whether any

12

substantial evidence—contradicted or uncontradicted—supports the jury's conclusion." ' [Citation.]" (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192.) " ' "In general, substantial evidence has been defined in two ways: first, as evidence of ' " 'ponderable legal significance . . . reasonable in nature, credible, and of solid value' " ' [citation]; and second, as ' "relevant evidence that a reasonable mind might accept as adequate to support a conclusion" ' [citation]." [Citation.] "Unless the finding, viewed in the light of the entire record, is so lacking in evidentiary support as to render it unreasonable, it may not be set aside." [Citation.]' [Citation.]" (*Nolte Sheet Metal, Inc. v. Occupational Safety & Health Appeals Bd.* (2020) 44 Cal.App.5th 437, 442.)

We, like the trial court, may not reweigh the evidence or judge the credibility of witnesses. " ' " 'If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. . . .' " ' [¶] When an appellate court reviews an order granting JNOV, it will ' " 'resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict.' " ' [Citation.]" (*In re Coordinated Latex Glove Litigation* (2002) 99 Cal.App.4th 594, 606.)

## 2. The Act

"The Elder Abuse and Dependent Adult Civil Protection Act ([§] 15600 et seq.) affords certain protections to elders and dependent adults. Section 15657 of the Welfare and Institutions Code provides heightened remedies to a plaintiff who can prove 'by clear and convincing evidence that a defendant is liable for physical abuse as defined in Section 15610.63, or neglect as defined in Section 15610.57,' and who can demonstrate that the

13

defendant acted with 'recklessness, oppression, fraud, or malice in the commission of this abuse.' " (*Winn*, *supra*, 63 Cal.4th at p. 152.) These remedies include an award of attorney's fees. (§ 15657, subd. (a).) Section 15610.57 defines "neglect" as "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise," and includes "[f]ailure to protect from health and safety hazards." (§ 15610.57. subds. (a)(1), (b)(3).)

Section 15657.2 provides: "Notwithstanding this article, any cause of action for injury or damage against a health care provider, as defined in Section 340.5 of the Code of Civil Procedure, based on the health care provider's alleged professional negligence, shall be governed by those laws which specifically apply to those professional negligence causes of action."

3. **The trial court properly granted GAMC's motion for judgment notwithstanding the verdict.**

   3.1. **Substantial evidence does not support that GAMC had a robust caretaking or custodial relationship involving ongoing responsibilities with Kruthanooch.**

The court correctly concluded that the evidence presented at trial was insufficient to establish that a robust caretaking or custodial relationship existed between Kruthanooch and GAMC. Because the parties appear to agree that *Winn* is controlling, we examine the Supreme Court's decision and the decisions of the Courts of Appeal applying it in some detail before turning to the evidence presented in this case.

14

In *Winn*, the Supreme Court considered "whether a claim of neglect under the Elder Abuse Act requires a caretaking or custodial relationship—where a person has assumed significant responsibility for attending to one or more of those basic needs of the elder or dependent adult that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance." (*Winn, supra*, 63 Cal.4th at p. 155.) The decedent in that case was treated on an outpatient basis at the defendant's facilities for " 'painful onychomycosis,' a condition that may limit mobility and impair peripheral circulation." (*Id.* at pp. 152–153.) One of the doctors employed by the defendant noted impaired vascular flow in the decedent's lower legs, and ultimately she was diagnosed with peripheral vascular disease. (*Id.* at p. 153.) Doctors employed by the defendant treated the decedent on a number of subsequent occasions but never referred the decedent to a specialist, even though on two of these visits the doctor was unable feel a pulse in the decedent's feet. (*Ibid.*) The day after her last visit to the defendant's facilities, the decedent was hospitalized "with symptoms consistent with ischemia and gangrene. She suffered from sepsis, or blood poisoning, which caused her foot to appear black, and doctors unsuccessfully attempted a revascularization procedure." (*Id.* at pp. 153–154.) After two amputation procedures, the decedent was hospitalized for blood poisoning and died several days later. (*Id.* at p. 154.)

The plaintiffs in *Winn* asserted a cause of action against the defendants under the Act. (*Winn, supra*, 63 Cal.4th at p. 154.) The court sustained the defendants' demurrer without leave to amend and the plaintiffs appealed. (*Ibid.*) A majority of the Court of Appeal reversed, concluding that the Elder Abuse Act "does not require the existence of a custodial relationship in

order for the plaintiff to establish a cause of action for neglect" and that "the 'statutory language simply does not support defendants' contention that only "care custodians" are liable for elder abuse.' " (*Id*. at pp. 154–155.)

Our high court concluded that "the Act does not apply unless the defendant health care provider had a substantial caretaking or custodial relationship, involving ongoing responsibility for one or more basic needs, with the elder patient. It is the nature of the elder or dependent adult's relationship with the defendant—not the defendant's professional standing— that makes the defendant potentially liable for neglect." (*Winn*, *supra*, 63 Cal.4th at p. 152.) In construing section 15610.57, which defines neglect and sets forth a nonexhaustive list of examples, our high court emphasized that most of the examples "seem to contemplate . . . the existence of a robust caretaking or custodial relationship—that is, a relationship where a certain party has assumed a significant measure of responsibility for attending to one or more of an elder's basic needs that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance." (*Winn*, at pp. 157–158.)

The Supreme Court observed that "[t]he remaining example of neglect—the '[f]ailure to provide medical care for physical and mental health needs' (§ 15610.57, subd. (b)(2))—fits the pattern. As with the other examples of neglect, the failure to provide medical care assumes that the defendant is in a position to deprive an elder or a dependent adult of medical care . . . . Read in tandem, section 15610.57, subdivisions (a)(1) and (b)(2) support a straightforward conclusion: whether a determination that medical care should be provided is made by a health care provider or not, it is the defendant's relationship with an elder or

16

a dependent adult—not the defendant's professional standing or expertise—that makes the defendant potentially liable for neglect." (*Winn*, *supra*, 63 Cal.4th at p. 158.)

Thus, the Legislature had "enacted a scheme distinguishing between—and decidedly not lumping together— claims of professional negligence and neglect. [Citations.] The Act seems premised on the idea that certain situations place elders and dependent adults at heightened risk of harm, and heightened remedies relative to conventional tort remedies are appropriate as a consequence. [Citation.] Blurring the distinction between neglect under the Act and conduct actionable under ordinary tort remedies—even in the absence of a care or custody relationship—risks undermining the Act's central premise. Accordingly, plaintiffs alleging professional negligence may seek certain tort remedies, though not the heightened remedies available under the Elder Abuse Act." (*Winn*, *supra*, 63 Cal.4th at pp. 159–160.) The court explained that the "limited availability of heightened remedies is indicative of a determination that individuals responsible for attending to the basic needs of elders and dependent adults that are unable to care for themselves should be subject to greater liability where those caretakers or custodians act with recklessness, oppression, fraud, or malice. [Citation.]" (*Id.* at p. 160.) Accordingly, the Supreme Court was persuaded "that the concept of neglect— though broad enough to encompass settings beyond residential care facilities—is not intended to apply to any conceivable negligent conduct that might adversely impact an elder or dependent adult." (*Ibid.*)

Turning to the facts before it, the Supreme Court observed that, "[b]eyond the assertion that defendants treated [the

17

decedent] at outpatient 'clinics' operated by defendants, plaintiffs offer no other explanation for why defendants' intermittent, outpatient medical treatment forged a caretaking or custodial relationship between [the decedent] and defendants. No allegations in the complaint support an inference that [the decedent] relied on defendants in any way distinct from an able-bodied and fully competent adult's reliance on the advice and care of his or her medical providers. Accordingly, we hold that defendants lacked the needed caretaking or custodial relationship with the decedent." (*Winn*, *supra*, 63 Cal.4th at p. 165.)

Only two published Court of Appeal decisions have considered whether a caretaking or custodial relationship existed under *Winn*. In *Stewart v. Superior Court* (2017) 16 Cal.App.5th 87 (*Stewart*), Division Two of the Fourth District held that the lower court had erred in summarily adjudicating the elder abuse cause of action. In *Stewart*, the decedent, who was 78 years old and experiencing confusion, was admitted to St. Mary Medical Center (St. Mary). (*Id.* at p. 91.) Evidence supported that the decedent was " 'markedly somnolent' and . . . 'open[ed his] eyes only transiently,' " "was not consuming adequate nutrition," was " 'a very poor historian[,] . . . only grunt[ed] and mumble[d] and [was] unable to provide any intelligible history.' " (*Id.* at pp. 95–96). He had named the plaintiff, Stewart, his durable power of attorney for health care decisions. (*Id.* at p. 91.) Defendants and real parties in interest planned to perform surgery and implant a pacemaker in the decedent, but Stewart canceled the procedure and requested a second opinion regarding the decedent's need for a pacemaker. (*Ibid.*) Several days later, defendants and real parties in interest informed Stewart that a pacemaker procedure was scheduled for the following day. (*Id.* at p. 92.) Stewart

18

stated that she would not consent to such a procedure and again requested a second opinion. (*Ibid.*) The next day, defendants and real parties in interest determined through St. Mary's risk management department that they could continue with the procedure despite Stewart's objection. (*Ibid.*) Several days later, Stewart called to inquire about the decedent and learned that he was scheduled for surgery. (*Ibid.*) Stewart objected again to the procedure. (*Ibid.*) When she arrived at the hospital, Stewart learned that the surgery was already underway. (*Ibid.*) The decedent went into cardiac arrest that day and suffered brain damage. (*Ibid.*) The court granted the defendants' motion for summary adjudication of the elder abuse claim, reasoning that " '[i]nterpreting the power of attorney then letting a . . . surgery occur was not withholding care or not within custodial capacity.' " (*Id.* at p. 99.)

In reversing, the reviewing court reasoned that "it appears [the decedent] depended on St. Mary to meet his basic needs in ways that establish the type of custodial relationship described by the *Winn* court." (*Stewart*, *supra*, 16 Cal.App.5th at p. 102.) The court "note[d] [the decedent's] admission to an acute care facility such as St. Mary, standing alone, would have been sufficient to make him a 'dependent adult' who would be entitled to the Act's protections even if he had not also qualified as an 'elder' by virtue of his age," but also relied on the facts of the case to support its conclusion. (*Ibid.*) The court observed that "[the decedent] was experiencing confusion upon admission, and a doctor's note prepared a week after admission describes him as a 'very poor historian' who could not provide a coherent history and tended only to mumble and grunt," and that the record showed

19

that "at times [decedent] needed medical assistance, including a G-tube, to consume adequate calories." (*Ibid.*)

The court in *Stewart* rejected St. Mary's request that it "make a care and custody determination as to the specific circumstances surrounding the ethics committee meeting instead of as to the relationship between [the decedent] and St. Mary as a whole." (*Stewart*, *supra*, 16 Cal.App.5th at p. 102.) The court of appeal found that "St. Mary accepted [the decedent] as a patient with knowledge of his 'confus[ed]' state, which left him a 'poor historian,' and its records show [the decedent] at times required assistance with feeding. Moreover, the ethics committee authorized the performance of surgery on [the decedent's] behalf on the assumption that he lacked the ability to consent." (*Id.* at p. 103.) Thus, in the court's view, "St. Mary had accepted responsibility for assisting [the decedent] with acts for which '[o]ne would not normally expect an able-bodied and fully competent adult to depend on another.' [Citation.]" (*Ibid.*) The court of appeal further emphasized that it was "troubled that labeling this case one for no more than professional negligence seriously undervalues the interest [the decedent] had in consenting or objecting to the surgery that, in the opinion of Stewart's experts, contributed to his death." (*Id.* at p. 104.) "The California Supreme Court has described the right to consent to medical treatment as ' "basic and fundamental," ' 'intensely individual,' and 'broadly based.' " (*Id.* at p. 105.) The court therefore had "difficulty concluding that the deprivation of a right as important as personal autonomy . . . cannot amount to more than professional negligence in the context of this case." (*Id.* at p. 106.)

More recently, the Third District applied the care or custody requirement in *Winn* in *Oroville Hospital v. Superior Court* (2022) 74 Cal.App.5th 382 (*Oroville*).  In *Oroville*, the decedent depended on her granddaughter for basic needs such as dressing, eating, taking medications, using the restroom, attending physician appointments, and diabetes management. (*Id.* at pp. 388, 392.)  The decedent was referred by her medical provider for in-home nursing care for an injury to her left ischium.  (*Id.* at p. 389.)  The defendants evaluated decedent and began providing in-home nursing services.  (*Ibid.*)  On the sixth visit to the decedent, the defendants documented that the wound appeared to be infected.  (*Ibid.*)  Someone called 911, and decedent was transferred to the emergency department at Oroville Hospital.  The decedent had developed sepsis.  (*Ibid.*) The decedent underwent an operation on her wound and was eventually discharged home with a new order for home health wound care.  (*Id.* at p. 390.)  The defendants resumed home health services and the decedent's wounds continued to worsen, but the defendants did not transfer the decedent to the hospital. (*Id.* at pp. 390–391.)  Approximately a week after the defendants resumed home services, the decedent's family called 911 and the decedent was taken to Oroville Hospital.  (*Id.* at p. 391.)  The decedent underwent surgery, but never regained her health and died several months later.  (*Ibid.*)

The defendants moved for summary judgment of the elder abuse claim on the ground that "they only provided in-home wound care on six occasions in July 2015 and four occasions in October 2015" and "[f]or all other aspects of her care, decedent relied on [her granddaughter]."  (*Oroville*, *supra*, 74 Cal.App.5th at p. 392.)  The defendants therefore argued that "the scope of

21

their care for decedent did not amount to a 'robust' and 'substantial' caretaking relationship of the type contemplated by the Elder Abuse Act as explained in *Winn*." (*Ibid.*) The court denied the motion for summary judgment, stating only that " 'triable issues of material fact exist as to whether Defendants had a substantial caretaking or custodial relationship with Decedent, whether the care and treatment Defendants provided to Decedent was within the applicable standard of care, and whether Defendants were a substantial factor in causing Decedents death.' " (*Id.* at p. 397.) The defendants filed a petition for a writ of mandate seeking relief from the court's denial of their motion for summary adjudication of the elder abuse claim. (*Ibid.*)

The Third District granted the relief requested by defendants. The court observed that "[i]t must be determined, on a case-by-case basis, whether the specific responsibilities assumed by a defendant were sufficient to give rise to a substantial caretaking or custodial relationship" and concluded that "defendants' provision of wound care to decedent did not give rise to the substantial caretaking or custodial relationship required to establish neglect under the Elder Abuse Act." (*Oroville, supra*, 74 Cal.App.5th at p. 405.) The court explained that "[w]ound care such as that at issue here is not a 'basic need' of the type an able-bodied and fully competent adult would ordinarily be capable of managing on his or her own. Indeed, plaintiffs themselves assert [decedent's granddaughter], presumably an able-bodied and fully competent adult, did not have the training to properly attend to decedent's wound care needs . . . ." (*Ibid.*) Thus, "the relationship at issue here is not the type of arrangement the Legislature was addressing in the

Elder Abuse Act." (*Id.* at p. 406.) The court in *Oroville* further relied on the Supreme Court's statement that "the failure to provide medical care 'assumes that the defendant is in a position to deprive an elder or a dependent adult of medical care' " and noted that the evidence before it "demonstrates defendants *were* providing medical care." (*Id.* at p. 407.) Accordingly, "defendants' alleged failure to provide *adequate* care is relevant to a professional negligence claim rather than a claim under the Elder Abuse Act." (*Ibid.*)

Considering the evidence presented at trial in its entirety in light of these cases, we conclude that there is no substantial evidence that the caretaking relationship between GAMC and Kruthanooch was robust and ongoing, as required for the Act to apply. Rather, the evidence demonstrates that the relationship was of a limited duration and GAMC's attention to Kruthanooch's basic needs was incidental to the circumscribed medical care it provided.

There is no question that Kruthanooch was ill when he presented at the emergency department. He reported weakness and lightheadedness and his medical records state that Kruthanooch's lower extremity weakness rendered him "essentially" unable to walk by that evening. While in the hospital, Kruthanooch received IV fluids to treat his dehydration and rhabdomyolysis, and he was transported to and from his MRI scan by hospital employees. However, there is no substantial evidence in the record supporting that Kruthanooch was cognitively impaired. His medical records state that he was alert, "oriented to person, place, time, and situation," cooperative, and pleasant. Further, the Estate did not elicit testimony at trial concerning whether and the extent to which Kruthanooch's

23

diagnoses rendered him unable to attend to his basic needs. There is no substantial evidence that, at the time he presented at GAMC, Kruthanooch sought or required ongoing assistance with eating, drinking, toileting, or any other basic needs. Rather, Kruthanooch's son Daniel testified that, prior to his burn injury, Kruthanooch was "very independent" and "did everything himself", and his son Sam similarly testified that Kruthanooch "did everything on his own."

At the time that Kruthanooch was injured, he had been at GAMC's facility between two and three hours. Kruthanooch was discharged on July 28, only two days after he presented for care.

As the Supreme Court explained in *Winn*, the Act does not apply unless the caretaking relationship is "robust" and the measure of responsibility assumed by the caretaker is "significant." (*Winn*, *supra*, 63 Cal.4th at p. 158.) *Winn* established that the "substantial relationship" must involve "*ongoing* responsibility for one or more basic needs[] with the elder patient," that "a party with only circumscribed, intermittent, or episodic engagement" is not among those who has care or custody of a vulnerable person," and "that the distinctive relationship contemplated by the Act entails more than casual or limited interactions." (*Id.* at pp. 152, 158, italics added.) Whether we look at the parties' relationship at the time of the alleged neglect prior to the MRI scan or at Kruthanooch's hospital stay in its entirety, substantial evidence fails to support that the relationship was robust or that GAMC assumed ongoing responsibility for Kruthanooch's basic needs.

The circumstances present here are plainly distinguishable from those present in cases in which a robust caretaking or custodial role was found to be present. In *Winn*, the Supreme

24

Court concluded that two of its past decisions interpreting the Act comported with the care and custody requirement because the defendants in both cases had "explicitly assumed responsibility for attending to the elders' most basic needs." (*Winn*, *supra*, 63 Cal.4th at pp. 160–161, citing *Delaney v. Baker* (1999) 20 Cal.4th 23, 27 (*Delaney*) and *Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 778 (*Covenant Care*).) Both cases involved skilled nursing homes that, over the course of weeks and months, failed to attend to the elders' basic needs, including hygiene and "nutrition, hydration, and medication." (See *Delaney*, at p. 41; *Covenant Care*, at pp. 777–778.) Although "[a]n individual might assume the responsibility for attending to an elder's basic needs in a variety of contexts and locations, including beyond the confines of a residential care facility" (*Winn*, at p. 158), we find no substantial evidence of an explicit assumption of ongoing caretaking responsibilities under the circumstances present here. Moreover, the duration of time in which the decedents in *Delaney* and *Covenant Care* were within the care of the defendants underscores that, unlike here, the relationship between the parties was not of a circumscribed or limited duration.

  *Stewart*, *supra*, 16 Cal.App.5th 87, like this case, involved an acute care facility's treatment of an elder. However, unlike here, the decedent had been in the hospital's care for three weeks when it performed surgery without the approval of the decedent's designee. (*Id.* at pp. 91–92.) The hospital was also aware from the outset that it was accepting a patient who " '[c]learly' could not make decisions on his own," and "authorized the performance of surgery on [the decedent's] behalf on the assumption that he lacked the ability to consent." (*Id.* at pp. 96, 103.) Further,

because the case involved the decedent's right to make decisions concerning his own treatment, the court of appeal was reluctant to label the defendant's misconduct as mere professional negligence. (*Id.* at p. 104.) While perhaps not a basic need of an able-bodied adult, personal autonomy is a " ' "basic and fundamental" ' " right. (*Id.* at p. 105.)

As discussed above, substantial evidence does not support that Kruthanooch was cognitively impaired or incapable of expressing his wishes. Further, there is no evidence in the trial record that GAMC assumed responsibility for making medical decisions without Kruthanooch's consent, or otherwise usurped any of Kruthanooch's fundamental rights in a manner that blurred the line between health care provider and caretaker or custodian.

The parties dispute whether the evidence supports that Kruthanooch was an inpatient at the time he sustained the injury in the MRI machine. The Act provides that admission to an acute care facility, standing alone, is sufficient to bring an adult patient within the statutory definition of a "dependent adult," and thus at least hypothetically entitled to the Act's protections. (See *Stewart*, *supra*, 16 Cal.App.5th at p. 102, citing § 15610.23, subd. (b) and Health & Saf. Code, § 1250, subd. (a).) The evidence is, at best, unclear as to when Kruthanooch was admitted.[4] For the sake of argument, we will assume that there

---

[4] The emergency department records state that admitting orders were requested at 6:48 p.m., after the MRI scan, and Dr. Gibbs' note stating that Kruthanooch "will require admission" was signed at 7:21 p.m. In arguing that Kruthanooch was admitted prior to the MRI scan, the Estate relies in part on testimony from GAMC's expert witness, Dr. Dubrow, in which he agreed that Kruthanooch "was in such poor health that he was admitted to the hospital as an inpatient through

26

is substantial evidence to support that Kruthanooch had been admitted to the telemetry unit at the time the MRI scan took place.

We are not persuaded that a hospital necessarily assumes a robust caretaking or custodial relationship and ongoing responsibility for the basic needs of every person admitted. In *Winn*, the Supreme Court rejected the argument that where a defendant fits within the definition of "care custodian" under section 15610.17, the defendant "will, as a matter of law, always satisfy the particular caretaking or custodial relationship required to show neglect under section 15610.57." (*Winn, supra,* 63 Cal.4th at p. 164.) Rather, "the statute requires a separate analysis to determine whether such a relationship exists." (*Ibid.*) Thus, even where statutory definitions of "dependent adult" or "care custodian" are satisfied, "[i]t must be determined, on a case-by-case basis, whether the specific responsibilities assumed by a defendant were sufficient to give rise to a substantial caretaking or custodial relationship." (*Oroville, supra,* 74 Cal.App.5th at p. 405.)

---

the emergency room." Standing alone, we are not persuaded that his testimony is "credible, and of solid value," as Dr. Dubrow had no involvement in Kruthanooch's care. (*Nolte Sheet Metal, Inc. v. Occupational Safety & Health Appeals Bd.*, *supra*, 44 Cal.App.5th at p. 442.) The Estate also relies upon testimony from Ulrich in which she stated that Kruthanooch was assigned to the telemetry unit at some point during his stay and that she understood that Kruthanooch was an inpatient. It is unclear whether she was referring to the time period before the MRI scan took place. Finally, the Estate points to Kruthanooch's emergency department reports, which state "Enc Type Inpatient." This particular note is not accompanied by any time stamp.

27

The Estate contends that a robust custodial relationship required by *Winn* existed here because Kruthanooch received assistance with hydration and mobility while in the hospital. For its part, GAMC argues that the IV hydration he received was part of his treatment for rhabdomyolysis and that there is no evidence in the record that Kruthanooch was incapable of drinking on his own. Both contentions appear to be true. Nevertheless, substantial evidence presented at trial supports that, at one point or another, GAMC assisted with Kruthanooch's mobility and hydration, both of which may fairly be characterized as "basic needs that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance." (*Winn, supra,* 63 Cal.4th at p. 158).[5]

However, *Winn* does not state that the protections and heightened remedies available under the Act are available to any inpatient who receives assistance, however briefly, with one or more basic needs. This would result in a "lumping together" of professional negligence and neglect claims, contrary to the Supreme Court's pronouncement that the Act was intended to distinguish between such claims.[6] (*Winn, supra,* 63 Cal.4th at

---

[5] The Estate also argues that GAMC assumed responsibility to provide food to the decedent. Neither the trial exhibit nor testimony cited by the Estate makes any mention of food or feeding. The Estate does not cite, nor are we aware of, any evidence that Kruthanooch was incapable of feeding himself.

[6] As an example, one can imagine an able-bodied and cognitively unimpaired young woman who sustains a back injury while hiking on a hot day. Because the injury renders her unable to walk without difficulty and she is weak from dehydration, she presents at an acute care facility for treatment and is admitted. As noted above, her admission to such a facility alone is sufficient to render her a

p. 159.)  As discussed, the Supreme Court rejected the assertion that "circumscribed engagement" and "limited interactions" are sufficient to establish the caretaking relationship required under the law.  (*Id.* at p. 158.)  Thus, GAMC's assistance with these needs on a limited basis during its provision of medical treatment to Kruthanooch is not substantial evidence of the custodial or caretaking relationship required by *Winn*.

Finally, the Estate argues that GAMC assumed responsibility for Kruthanooch's basic need of "protection from health and safety hazards."  The Estate asserts that, "[a]t the time of the injury itself, Mr. Kruthanooch was confined inside an MRI tube and completely reliant on the staff of GAMC."  GAMC's failure to protect Kruthanooch from his MRI injury does not bolster the argument that a robust caretaking relationship existed between GAMC and Kruthanooch.  Every patient who undergoes an MRI scan, no matter their age or cognitive and physical abilities, is reliant upon the MRI technologist to ensure that the scan is conducted in a safe manner.  Just as "[w]ound care . . . is not a 'basic need' of the type an able-bodied and fully competent adult would ordinarily be capable of managing on his

---

"dependent adult" under section 15610.23, subdivision (b).  This woman might, like Kruthanooch, receive IV hydration, be transported for an MRI scan via a gurney, and sustain a burn wound from the MRI because the technologist did not properly screen her for electrically conductive materials.  If an acute care facility's temporary assistance with hydration and mobility is sufficient to establish the requisite caretaking or custodial relationship, there is no reason why this woman could not also recover under the Act, even though she is not "particularly vulnerable and reliant" and thus is not in the class of people that the Act was intended to protect.  (*Winn, supra*, 63 Cal.4th at p. 160.)

or her own," screening for ferromagnetic and electrically conductive materials before undergoing an MRI scan "require[s] competent professional . . . attention." (*Oroville, supra*, 74 Cal.App.5th at p. 405.)

In sum, we hold that the evidence in this case, viewed in its totality, does not permit the conclusion that a robust and substantial caretaking or custodial relationship with ongoing responsibilities existed between GAMC and Kruthanooch. (*Winn, supra*, 63 Cal.4th at pp. 152, 158.) We do not suggest that such a relationship can never exist when an elder or dependent adult is an inpatient for only two days, or that, when an elder or dependent adult presents at such a facility seeking only medical care, the nature of the relationship between the parties cannot change. The condition of a patient can deteriorate, and the patient-provider relationship can expand into one in which the healthcare provider attends to the patient's most basic needs for an uncircumscribed length of time. We merely conclude that substantial evidence does not support that the relationship between Kruthanooch and GAMC was at any point anything more than that of a patient and healthcare provider.

### 3.2. There is no substantial evidence that GAMC's conduct constituted neglect under the Act.

Substantial evidence also fails to support that the conduct at issue in this action—GAMC's failure to properly screen Kruthanooch prior to his MRI scan—falls within the definition of neglect under the Act. Thus, we agree with the court's conclusion on this issue.

We begin by examining the Supreme Court's decisions distinguishing between neglect under the Act and professional negligence. In *Delaney*, the court construed two provisions of the

Act: section 15657, which grants enhanced remedies for reckless neglect, and section 15657.2, which limits recovery for actions grounded in professional negligence, and concluded that reckless neglect is separate from professional negligence and thus the restrictions on remedies against health care providers for professional negligence do not apply. (*Delaney*, *supra*, 20 Cal.4th at pp. 28–29.)

Our high court adopted the view that the phrase "based on professional negligence" should be read to mean that "reckless neglect" under section 15657 is distinct from causes of action "based on professional negligence" within the meaning of section 15657.2. (*Delaney*, *supra*, 20 Cal.4th at pp. 30–31.) The court explained that the "explicit exclusion of 'professional negligence' . . . [citation], make[s] clear the [Act's] goal was to provide heightened remedies for . . . 'acts of egregious abuse' against elder and dependent adults [citation], while allowing acts of negligence in the rendition of medical services to elder and dependent adults to be governed by laws specifically applicable to such negligence." (*Id.* at p. 35.)

In *Covenant Care*, *supra*, 32 Cal.4th 771, the Supreme Court considered "whether the procedural prerequisites to seeking punitive damages in an action for damages arising out of the professional negligence of a health care provider . . . [citation], apply to punitive damage claims in actions alleging elder abuse" and concluded they did not. (*Id.* at p. 776.)

The Supreme Court observed that "[i]n its ordinary sense, 'professional negligence' is failure to exercise ' "knowledge, skill, and care ordinarily employed by members of the profession in good standing." ' [Citation.] Hence, such misconduct as plaintiffs alleged—intentional, egregious elder abuse—cannot be described

31

as mere 'professional negligence' in the ordinary sense of those words." (*Covenant Care, supra*, 32 Cal.4th at pp. 781–782.) The Supreme Court explained that, "[a]s used in the Act, neglect refers not to the substandard performance of medical services but, rather, to the 'failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations.' [Citation.] Thus, the statutory definition of 'neglect' speaks not of the *undertaking* of medical services, but of the failure to *provide* medical care." (*Id.* at p. 783.)

Our high court rejected defendants' argument that "elder abuse, when committed by a health care provider, is 'an injury that is directly related to the professional services provided by a health care provider acting in its capacity as such.' " (*Covenant Care, supra*, 32 Cal.4th at pp. 785–786.) The court explained that "elder abuse as defined in the Act, even when committed by a health care provider, is not an injury that is 'directly related' to the provider's professional services. . . . [¶] [C]laims under the Elder Abuse Act are not brought against health care providers in their capacity as providers but, rather, against custodians and caregivers that abuse elders and that may or may not, incidentally, also be health care providers. . . . '[T]he fact that some health care institutions, such as nursing homes, perform custodial functions *and* provide professional medical care' [citation] does not mean the two functions are the same." (*Id.* at p. 786.)

In *Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, Division One of the Fourth District distilled from the Act and case law, including *Delaney* and *Covenant Care*, "several factors that must be present for conduct to constitute

32

neglect within the meaning of the Elder Abuse Act." (*Id.* at p. 406.) These requirements include that the plaintiff must allege, and ultimately prove by clear and convincing evidence, that the defendant "denied or withheld goods or services necessary to meet the elder or dependent adult's basic needs, . . . with conscious disregard of the high probability of such injury (if the plaintiff alleges recklessness)." (*Id.* at pp. 406–407.) The court concluded that the plaintiffs had failed to adequately allege elder abuse where they "allege[d] that [the decedent] died because the Hospital did not administer the antibiotics [the decedent] needed to treat his pneumonia and did not have the proper size endotracheal tube in the crash cart." (*Id.* at p. 408.) The court observed that "[t]hese allegations indicate the Hospital did not deny services to or withhold treatment from [the decedent]—on the contrary, the staff actively undertook to provide treatment intended to save his life." (*Ibid.*)

Applying these principles here, we conclude that substantial evidence fails to support that GAMC committed neglect under the Act. There is no substantial evidence that GAMC harmed Kruthanooch by "fail[ing] to *provide* medical care" or by failing to "attend[] to [his] basics needs and comforts." (*Covenant Care*, *supra*, 32 Cal.4th at p. 783.) Rather, the evidence presented at trial supports that GAMC harmed Kruthanooch when *undertaking* medical services.

The Estate argues that GAMC's failure to properly screen Kruthanooch before conducting the MRI scan constituted a "[f]ailure to protect from health and safety hazards" under the Act. (§ 15610.57, subd. (b)(3).) The Estate cannot evade the limitations set forth in *Covenant Care* simply by characterizing a claim based on the undertaking of medical services as a failure to

protect a patient from health or safety hazards.  We have no reason to believe the Supreme Court did not consider all the statutory examples of neglect in the Act, including that on which the Estate relies, before concluding that neglect refers to a failure to provide medical care.  Moreover, most, if not all, acts of professional negligence are susceptible to characterization as a failure to protect.  For example, a surgeon who does not remove an instrument from the patient's body before closing the patient up has failed to protect the patient from infection and injury, and a doctor who prescribes the wrong medication or dosage fails to protect the patient from the medication's adverse effects.  We doubt the Supreme Court would have repeatedly emphasized the distinction between the neglect of an elder under the Act and professional negligence if the two causes of action could so easily be "lump[ed] together." (*Winn*, *supra*, 63 Cal.4th at p. 159.)

The Estate further argues that *Delaney* supports its argument "that evidence of professional negligence may go towards showing neglect under Section 15610.57, and may thus meet one element establishing reckless neglect under Section 15657, when taken together with Plaintiff's evidence showing such things as care and custody and recklessness." (Italics omitted.)  As a preliminary matter, substantial evidence does not support the conclusion that Kruthanooch was in GAMC's care and custody in this case.  Furthermore, *Delaney* does not support that professional negligence can always form the basis of a claim under section 15657.

In the portion of *Delaney* the Estate cites, the Supreme Court rejected the defendants' argument that malnutrition was the result of professional negligence (i.e., "the inability of nursing staff to prescribe or execute a plan of furnishing sufficient

34

nutrition to someone too infirm to attend to that need herself"), rather than neglect, and concluded that "such omission is also unquestionably 'neglect,' as that term is defined in former section 15610.57." (*Delaney*, *supra*, 20 Cal.4th at pp. 34–35.) By the defendants' own characterization, the purported professional negligence in *Delaney* was the failure or "inability" of the defendants' staff to act. Further, allowing a patient to suffer malnutrition is a failure to tend to a basic need (i.e., adequate nutrition). As explained above, an MRI scan is not a basic need. Thus, we find nothing in *Delaney* to support that a defendant's conduct can be reframed as neglect under the Act where, as here, substantial evidence fails to support that the claimed neglect was based on "the failure to *provide* medical care" (*Covenant Care*, *supra*, 32 Cal.4th at p. 783), or that the defendant "denied or withheld goods or services necessary to meet the elder or dependent adult's basic needs." (*Carter v. Prime Healthcare Paradise Valley LLC*, *supra*, 198 Cal.App.4th at pp. 406–407).

Finally, we reject as baseless the Estate's contention that, "[i]n a hospital case, the definition of neglect under that subsection *requires* evidence of professional negligence (*i.e.*, 'negligent failure')." As with any person or entity in a caretaking or custodial role, a hospital acting as a custodian may negligently fail to provide a patient with adequate hydration or nutrition, fail to tend to the patient's hygiene, or fail to provide medical care. (§ 15610.57, subd. (b)(1), (2), (4).) Such negligent failures are consistent with the definition of neglect under the Act and the Supreme Court's decisions and are not based on the negligent *undertaking* of medical care.

35

### 3.3. We decline to reach the remaining grounds on which the court granted JNOV and the issues raised in the cross-appeal.

Having concluded that substantial evidence does not support that there was a robust caretaking or custodial relationship between Kruthanooch and GAMC, or that GAMC's failure to properly screen Kruthanooch prior to the MRI scan was neglect as contemplated by the Act, it is unnecessary for us to address whether GAMC acted recklessly. It is also unnecessary for us to address the issues raised in GAMC's protective cross-appeal.

## DISPOSITION

The judgment is affirmed.  GAMC shall recover its costs on appeal.

## CERTIFIED FOR PUBLICATION

LAVIN, J.

WE CONCUR:


EDMON, P. J.


ADAMS, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.